## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

UNITED STATES OF AMERICA )
*Ex rel.* ROGER D. KING, )
c/o Keith & Associates, PLLC )
715 Bakewell Street )
Covington, KY 41011 )
)
        Plaintiff, )
)
v. )      Civil Action No.   2:15-cv-1788
)
OHIOHEALTH CORPORATION )
dba OHIOHEALTH )
Serve registered agent: )
Earl J. Barnes II, Esq. )
180 E. Broad St., 34th Floor, )
Columbus, OH 43215 )      **FILED *IN CAMERA***
)      **AND UNDER SEAL**
        and )
)
ALTERCARE OF OHIO, INC., )
dba ALTERCARE OF HILLIARD )      **JURY TRIAL DEMANDED**
POST-ACUTE CENTER, INC. )
Serve registered agent: )
Sais Corp. )
25109 Detroit Rd., Ste. 310 )
Westlake, OH 44145 )
)
        and )
)
EXTENDICARE HEALTH SERVICES, INC. )
dba ARBORS WEST )
Serve registered agent: )
Lexis Document Services, Inc. )
50 West Broad St., Ste. 1800 )
Columbus, OH 43215 )
)
        and )
)
VRABLE HEALTHCARE, INC. )
dba ARLINGTON COURT SKILLED )
NURSING AND REHAB CENTER, )
Serve registered agent: )

James R. Muckle                                    )
3248 W. Henderson Road                             )
Columbus, OH 43220                                 )
                                                   )
        and                                        )
                                                   )
CLIME LEASING CO., LLC,                            )
dba COLUMBUS HEALTHCARE CENTER                      )
Serve registered agent:                            )
ACFB Incorporated                                  )
200 Public Square, Ste. 2300                       )
Cleveland, OH 44114                                )
                                                   )
        and                                        )
                                                   )
PEREGRINE HEALTH SERVICES, INC.,                   )
dba CONVALARIUM OF DUBLIN                           )
Serve registered agent:                            )
CPM Statutory Agent Corp.                          )
366 E. Broad St.                                   )
Columbus, OH 43215                                 )
                                                   )
        and                                        )
                                                   )
HILLIARD HEALTH & REHABILITATION, INC.)
dba DARBY GLENN NURSING AND REHAB      )
Serve registered agent:                            )
Michael Provenza                                   )
25000 Country Club Blvd. #255                      )
North Olmsted, OH 44070                            )
                                                   )
        and                                        )
                                                   )
MANOR CARE OF WESTERVILLE, OH, LLC,    )
dba HEARTLAND OF UPTOWN WESTERVILLE)
Serve registered agent:                            )
C T Corporation System                             )
1300 East Ninth St.                                )
Cleveland, OH 44114                                )
                                                   )
        and                                        )
                                                   )
LAUREL HEALTH CARE COMPANY,                        )
dba THE LAURELS OF NORWORTH                         )
Serve registered agent:                            )
Bradford W. Payne                                  )

8181 Worthington Rd.                                            )
Westerville, OH 43082                                          )
                                                               )
        and                                                    )
                                                               )
                                                               )
LIFE CARE CENTERS OF AMERICA, INC.                             )
dba MAYFAIR VILLAGE                                            )
NURSING CARE CENTER                                           )
Serve registered agent:                                        )
CSC-Lawyers Incorporating Service                             )
(Corporation Service Company)                                 )
50 W. Broad St., Ste. 1800                                    )
Columbus, OH 43215                                            )
                                                               )
        and                                                    )
                                                               )
THE MACINTOSH COMPANY,                                         )
dba MILL RUN GARDENS AND CARE CENTER )
and dba WHETSTONE GARDENS AND                                 )
CARE CENTER                                                   )
Serve registered agent:                                        )
Maura Miller                                                  )
3863 Trueman Court                                            )
Hilliard, OH 43026                                            )
                                                               )
        and                                                    )
                                                               )
FIRST COMMUNITY VILLAGE dba                                    )
NATIONAL CHURCH RESIDENCES FIRST                              )
COMMUNITY VILLAGE                                            )
Serve registered agent:                                        )
National Corporate Research, Ltd.                             )
3958 – D Brown Park                                           )
Hilliard, OH 43026                                            )
                                                               )
        and                                                    )
                                                               )
CAPITAL HEALTH SERVICES, INC.                                 )
dba SCIOTO COMMUNITY                                          )
Serve registered agent:                                        )
Kenneth J. Bernsen                                           )
5020 Philadelphia Dr.                                        )
Dayton, OH 45415                                             )
                                                               )
        and                                                    )

3

THE METHODIST RETIREMENT CENTER )
OF CENTRAL OHIO, )
dba WESLEY GLEN )
Serve registered agent: )
Margaret R. Carmany )
5155 N. High Street )
Columbus, OH 43214 )
                                              )
        and                                   )
                                              )
OHIO PRESBYTERIAN RETIREMENT )
SERVICES, )
dba WESTMINSTER THURBER COMMUNITY )
Serve registered agent: )
Thomas J. Kelly )
1001 Kingsmill Parkway )
Columbus, OH 43229 )
                                              )
        and                                   )
                                              )
WEXNER HERITAGE VILLAGE )
Serve registered agent: )
David E. Driver )
1151 College Ave. )
Columbus, OH 43209 )
                                              )
        Defendants.                           )
                                              )

---

## COMPLAINT PURSUANT TO FEDERAL FALSE CLAIMS ACT

---

The United States of America, by and through *qui tam* relator Roger D. King, brings this action under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, to recover all damages, penalties and other remedies established by the False Claims Act on behalf of the United States of America.

## INTRODUCTION

1.      This is an action by Relator to recover treble damages, restitution, and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733, and the common law for Defendant OhioHealth Corporation's ("OhioHealth") solicitation and reception of remunerations in exchange for patient referrals to the other sixteen (16) named Defendants (individually a "Network SNF" and collectively the "Network SNFs"), operators of the skilled nursing facilities which comprise OhioHealth's Skilled Nursing Facility Continuing Care Network (the "OhioHealth SNF Network"), in violation of the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

2.      This lawsuit involves a scheme designed and operated by OhioHealth, one of the largest hospital systems in Columbus, Ohio, to demand kickbacks from skilled nursing facilities ("SNFs") in exchange for OhioHealth exclusively referring Medicare patients in need of skilled nursing care to the SNFs.

3.      OhioHealth's scheme exploits the special trust that patients place in their hospital and skilled nursing facility ("SNF").  Patients rely on the expertise and objectivity of their hospital and SNF when seeking referrals for medical care.  Unbeknownst to the patients, and the public at large, OhioHealth corrupted the objectivity of this process by demanding kickbacks from the SNFs in exchange for an exclusive referral arrangement.  Under this kickback arrangement, OhioHealth only selected SNFs for the OhioHealth SNF Network that agreed to participate in a cross-referral agreement and financially benefited OhioHealth by absorbing costs that OhioHealth would otherwise absorb.  To maintain a position in the OhioHealth SNF Network, each SNF must continue to participate in the cross-referral agreement, absorb many

costs that OhioHealth would otherwise absorb, and provide various extraordinary services to OhioHealth.

4.       Publicly-funded healthcare programs are forbidden by law and by regulation from reimbursing healthcare providers for services that were provided as a result of kickbacks.

5.       As a result of this OhioHealth orchestrated scheme, OhioHealth knowingly caused the Network SNFs to submit millions of dollars in false reimbursement claims for skilled nursing care to publicly-funded healthcare programs. OhioHealth also knowingly submitted false claims to publicly-funded healthcare programs for services rendered to those patients referred by the Network SNFs as a result of the cross-referral agreement by and between OhioHealth and each Network SNF.

6.       The Network SNFs knowingly submitted millions of dollars in false reimbursement claims to publicly-funded healthcare programs for skilled nursing care that was provided as a result of kickbacks.

7.       The False Claims Act, more specifically 31 U.S.C. § 3730, allows any person having knowledge of a violation to bring an action for himself and for the United States Government and to share in any recovery. The False Claims Act requires that the complaint be filed *in camera* and under seal for a minimum of sixty (60) days to allow the United States Government time to conduct its own investigation and determine whether to join the suit.

## PARTIES

8.       Relator Roger D. King ("Relator") brings this action on behalf of the United States of America pursuant to the qui tam provisions of the False Claims Act, 31 U.S.C. § 3729 *et seq.*

9.     The United States of America, acting through the Department of Health and Human Services ("HHS"), administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, et seq. (Medicare), and grants to States for Medical Assistance Programs pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* (Medicaid).

10.     To be eligible for payment under the Medicare program and Medicaid program, healthcare providers must certify that the payment of a claim is conditioned upon the underlying transaction complying with applicable laws, including the Federal Anti-Kickback Statute.

11.     Relator is a United States citizen and resident of Florida.

12.     Relator is an insider in the skilled nursing care industry in Ohio and has been involved in the industry since 1989.  Since 1995, Relator has served as the President of the Academy of Senior Health Sciences, Inc., a trade association representing the interests of its members (namely SNFs operating in Ohio).  In 1989, Relator founded Carington Health Systems and oversaw the expansion of the company from two Ohio SNFs to thirty-four Ohio SNFs before selling his interest in the company in 2004.  Since 1989, Relator has founded, developed, and operated various companies that provide services to Ohio SNFs.  A copy of the Affidavit of Facts of Roger D. King is attached hereto as Exhibit "1" and incorporated by reference herein.

13.     Relator has direct and independent knowledge of the information on which the allegations in this Complaint are based because of Relator's activity in and knowledge of the Ohio skilled nursing industry.  Relator is the original source of the information, because he discovered information on which the allegations in this Complaint are based through his own private investigations.

14.    Relator became aware that OhioHealth was designing the OhioHealth SNF Network and chose to investigate the Network.  As an insider in the Ohio skilled nursing care industry, Relator requested and was able to attain private information (documents and otherwise) from various SNFs in the Columbus, Ohio area regarding the OhioHealth SNF Network.  Some of the SNFs that provided information to Relator were selected to participate in the OhioHealth SNF Network and some were not.  Relator continued to gather information regarding the OhioHealth SNF Network after the network launched on or about March 1, 2014

15.    Relator has standing to bring this action because his knowledge of the OhioHealth SNF Network is not based on public information, but instead private information that could only be accessed because of his position as an insider in Ohio skilled nursing care industry.   A majority of the information relied upon for this Complaint is not public knowledge.

16.    Defendant OhioHealth is an Ohio corporation with its headquarters in Columbus, Franklin County, Ohio.  Operationally, OhioHealth is a system of hospitals and healthcare providers located in Columbus, Ohio and surrounding areas.  OhioHealth member hospitals include without limitation the following: (1) MedCentral Shelby Hospital, (2) OhioHealth Doctors Hospital, (3) OhioHealth Dublin Methodist Hospital, (4) OhioHealth Grady Memorial Hospital, (5) OhioHealth Grant Medical Center, (6) OhioHealth Hardin Memorial Hospital, (7) OhioHealth Marion General Hospital, (8) OhioHealth MedCentral Mansfield Hospital, (9) OhioHealth O'Bleness Hospital, and (10) OhioHealth Riverside Methodist Hospital. OhioHealth is further comprised of healthcare centers located throughout the State of Ohio including without limitation for sleep services, health and fitness, endoscopy, cancer, senior health, rehabilitation, oncology, radiology, imaging, mammography, hospice services, heart health, urgent care, and women's health.

17.    Defendant Altercare of Ohio, Inc. ("Altercare") is an Ohio corporation with its headquarters in North Canton, Ohio.  Altercare operates eighteen (18) facilities specializing in rehabilitation, nursing care, post-acute care, or some variation thereof.  Seventeen (17) of these eighteen (18) facilities are located in the State of Ohio and the outlier is located in the State of Michigan.  Altercare operates Altercare of Hilliard Post-Acute Center, Inc., a skilled nursing facility ("SNF") located in Hilliard, Ohio that is a member of the OhioHealth SNF Network.

18.    Defendant Extendicare Health Services, Inc. ("Extendicare") is a Delaware corporation registered to do business in the State of Ohio as a foreign corporation. Extendicare's headquarters is located in the State of Wisconsin.  Extendicare operates one hundred forty-seven (147) SNFs throughout the United States, twenty-three of which are located in the State of Ohio, and fifty-eight (58) SNFs throughout Canada.  Extendicare operates Arbors West, a SNF located in West Jefferson, Ohio that is a member of the OhioHealth SNF Network.

19.    Defendant Vrable Healthcare, Inc. ("Vrable") is an Ohio corporation with its headquarters in Columbus, Ohio.  Vrable operates three (3) SNFs and one (1) senior living center, all located in the State of Ohio.  Vrable operates Arlington Court Skilled Nursing & Rehab Center, a SNF located in Upper Arlington, Ohio that is a member of the OhioHealth SNF Network.

20.    Defendant Clime Leasing Co., LLC ("Clime") is an Ohio limited liability company with its headquarters in Cincinnati, Ohio.  Clime operates Columbus Healthcare Center, a SNF located in Columbus, Ohio that is a member of the OhioHealth SNF Network.

21.    Defendant Peregrine Health Services, Inc. ("Peregrine") is an Ohio corporation with its headquarters in Columbus, Ohio.  Peregrine operates fifteen (15) facilities located throughout the State of Ohio specializing in rehabilitation, nursing care, post-acute care, or some

variation thereof. Peregrine operates The Convalarium of Dublin, a SNF located in Dublin, Ohio that is a member of the OhioHealth SNF Network.

22.    Defendant Hilliard Health & Rehabilitation, Inc. ("Hilliard") is an Ohio corporation with its headquarters in Hilliard, Ohio. Hilliard operates Darby Glenn Nursing & Rehabilitation Center, a SNF located in Hillard, Ohio that is a member of the OhioHealth SNF Network.

23.    Defendant Manor Care of Westerville, OH, LLC ("Manor Care") is a Delaware limited liability company registered to do business in the State of Ohio as a foreign limited liability company. Manor Care's headquarters is in the State of Delaware. Manor Care operates Heartland of Uptown Westerville, a SNF located in Westerville, Ohio that is a member of the OhioHealth SNF Network.

24.    Defendant Laurel Health Care Company ("Laurel") is a Delaware corporation registered to do business in the State of Ohio as a foreign corporation. Laurel's headquarters is in Westerville, Ohio. Laurel operates forty-three (43) SNFs, nineteen (19) of which are located in the State of Ohio. Laurel operates The Laurels of Norworth, a SNF located Worthington, Ohio that is a member of the OhioHealth SNF Network.

25.    Defendant Life Care Centers of America, Inc. ("Life Care") is a Tennessee corporation registered to do business in the State of Ohio as a foreign corporation. Life Care's headquarters is in Tennessee. Life Care operates more than two hundred twenty (220) SNFs nationwide, four (4) of which are located in the State of Ohio. Life Care operates Mayfair Village Nursing Care Center, a SNF located in Columbus, Ohio that is a member of the OhioHealth SNF Network.

26.     Defendant The MacIntosh Company ("MacIntosh") is an Ohio corporation with its headquarters in Hilliard, Ohio.  MacIntosh operates five (5) SNFs, all located in the State of Ohio.  MacIntosh operates Mill Run Gardens & Care Center ("Mill Run"), a SNF located in Hilliard, Ohio and Whetstone Gardens & Care Center ("Whetstone Gardens"), a SNF located in Columbus, Ohio.  Both Mill Run and Whetstone Gardens are members of the OhioHealth SNF Network.

27.     Defendant First Community Village ("FCV") is an Ohio non-profit corporation with its headquarters in Upper Arlington, Ohio.  FCV operates three hundred twenty-nine (329) senior communities nationwide, ninety-three (93) of which are located in the State of Ohio.  FCV operates National Church Residences First Community Village, a SNF located in Columbus, Ohio that is a member of the OhioHealth SNF Network.

28.     Defendant Capital Health Services, Inc. ("Capital") is an Ohio corporation with its headquarters in Dayton, Ohio.  Capital operates eight (8) SNFs, all of which are located in the State of Ohio.  Capital operates the Scioto Community, a SNF located in Columbus, Ohio that is a member of the OhioHealth SNF Network.

29.     Defendant the Methodist Retirement Center of Central Ohio ("MRCCO") is an Ohio corporation with its headquarters in Columbus, Ohio.  MRCCO operates two (2) SNFs, both of which are located in the State of Ohio.  MRCCO operates Wesley Glen, a SNF located in Columbus, Ohio that is a member of the OhioHealth SNF Network.

30.     Defendant Ohio Presbyterian Retirement Services ("OPRS") is an Ohio corporation with its headquarters in Columbus, Ohio.   OPRS operates twelve (12) SNFs, all of which are located in the State of Ohio.  OPRS operates the Westminster-Thurber Community, a SNF located in Columbus, Ohio that is a member of the OhioHealth SNF Network.

31.    Defendant Wexner Heritage Village ("Wexner") is an Ohio corporation with its headquarters in Columbus, Ohio. Wexner operates a SNF on its campus in Columbus, Ohio that is a member of the OhioHealth SNF Network.

32.    All sixteen (16) SNF operators named as defendants and the SNFs which comprise the OhioHealth SNF Network shall hereinafter be referred to individually as a "Network SNF" and collectively as the "Network SNFs".

### JURISDICTION & VENUE

33.    This action arises under the False Claims Act, 31 U.S.C. §§ 3729-3733.

34.    This Court has subject matter jurisdiction over this action because this is a civil action arising under the laws of the United States amounts to a federal question under 28 U.S.C. § 1331 and the action was brought by a private person alleging false claims as allowed under 31 U.S.C. § 3730(b). This Court has supplemental jurisdiction to entertain the common law causes of action under 28 U.S.C. § 1367(a).

35.    This Court may exercise personal jurisdiction over OhioHealth, and venue is proper in this Court under 31 U.S.C. § 3732(a), because: (i) OhioHealth's principal place of business is in this district; (ii) OhioHealth transacts business in this district and did so at all times relevant to this Complaint; and (iii) OhioHealth committed acts proscribed by 42 U.S.C. § 1320a-7b(a)-(b) – acts giving rise to this action – within this district.

36.    This Court may exercise personal jurisdiction over Defendant SNF operators Altercare, Vrable, Peregrine, Hilliard, Laurel, MacIntosh, FCV, Capital, MRCCO, OPRS, and Wexner, and venue is proper in this Court under 31 U.S.C. § 3732(a) because: (i) each has its respective principal place of business in this district; (ii) each transacts business in this district

and did so at all times relevant to this Complaint; and (iii) each committed acts proscribed by 42 U.S.C. § 1320a-7b(a)-(b) – acts giving rise to this action – within this district.

37.     This Court may exercise personal jurisdiction over Defendant SNF operators Extendicare, Clime, Manor Care, and Life Care, and venue is proper in this Court under 31 U.S.C. § 3732(a) because: (i) each transacts business in this district and did so at all times relevant to this Complaint; and (ii) each committed acts proscribed by 42 U.S.C. § 1320a-7b(a)-(b) – acts giving rise to this action – within this district.

38.     Prior to filing this Complaint, Relator served a copy of the same upon the United States Government, together with a written disclosure statement setting forth and enclosing all material evidence and information Relator possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

39.     Relator has complied with all conditions precedent to bringing this action.

40.     Relator is the original source of, and has direct and independent knowledge of, all non-publicly disclosed information on which any allegation herein might be deemed based, and has voluntarily provided such information to the United States before filing this action.  Specific disclosures include: facts stated in this Qui Tam Complaint; the Preliminary Expectations for OhioHealth Skilled Nursing Facility (SNF) Continuing Care Network (CCN); the OhioHealth SNF Survey Form; Credentialing Criteria for OhioHealth Skilled Nursing Facility (SNF) Continuing Care Network (CCN); the Continuing Care Network Skilled Nursing Facility Provider Agreement (Clinical Integration); the OhioHealth Skilled Nursing Facility (SNF) Continuing Care Network (CCN) Handbook of Quality Requirements; the Affidavit of Facts of Roger D. King; the Affidavit of Expert Opinion of Bert P. Cummins; and the Affidavit of Facts of Elizabeth Zink-Pearson.

## LEGAL BACKGROUND

**A.    The Anti-Kickback Statute**

41.    The Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that remuneration and gifts given to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the integrity of the Medicare and Medicaid programs from these harms, Congress enacted a prohibition against the payment of kickbacks in any form.  *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

42.    The AKS prohibits any person or entity from offering, making, soliciting, or accepting remuneration, in cash or in kind, directly or indirectly, to induce or reward any person for purchasing, ordering, or recommending or arranging for the purchasing or ordering of federally-funded medical goods or services.  Specifically, the AKS provides:

(b) Illegal remunerations

(1) whoever knowingly or willfully solicits or receives any remuneration (including kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind –

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –

    (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

    (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(1), (2). The statute ascribes liability to both sides of an impermissible "kickback" transaction. OhioHealth is liable under the AKS for demanding and receiving kickbacks in the form of some value or benefit from the Network SNFs. Network SNFs are liable under the AKS for providing such items of value to OhioHealth in order to participate in the referral network.

    43.    To prove a violation of the AKS, the Relator must show: (1) remuneration offered or paid; (2) in order to induce the referral of government healthcare business; and (3) done knowingly or willfully.

    44.    Remuneration under the AKS is interpreted broadly as meaning "anything of value in any form whatsoever." Remuneration is illegal if only one purpose of the transaction and payment is to induce a referral of business reimbursed under the Medicare or Medicaid program.

    45.    The "OIG Supplemental Compliance Program Guidance for Hospitals" designates that under the AKS, neither a legitimate business purpose for the arrangement, nor a fair market value payment, will legitimize a payment if there is also the illegal purpose of inducing referrals for Federal health care program business.

46.     Violations of the AKS implicate all claims that arise from the kickback relationship as false claims subject to 31 U.S.C. §3729(a)-(b).

**B.     The False Claims Act**

47.     The False Claims Act ("FCA") is an anti-fraud statute that prohibits the knowing submission of false or fraudulent claims to the federal government.     The FCA provides, in relevant part, that:

(a)     (1) Any person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim; (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);…or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person….

(b)     For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(a)-(b).

48.     Ohio has similar prohibitions on false statements and false claims which include claims attributable to improper kickbacks.  O.R.C. §§2913.40 and 5164.35.

49.     A false certification of compliance with the AKS in a Medicare and Medicaid cost reports is actionable under the FCA.  False claims to Medicare and Medicaid, including costs declared on cost reports and individual claims for payment are actionable under the FCA.

C.     The Hospital Readmissions Reduction Program

50.     Section 3025 of the Affordable Care Act added section 1886(q) to the Social Security Act establishing the Hospital Readmissions Reduction Program, which requires CMS to reduce payments to Inpatient Prospective Payment System ("IPPS") hospitals with excess readmissions, effective for discharges beginning on October 1, 2012. (http://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AcuteInpatientPPS/Readmissions-Reduction-Program.html; accessed April 14, 2015). Such regulations governing the Hospital Readmission Reductions Program are codified in 42 C.F.R. § 412.150 - § 412.154.

51.     42 C.F.R. § 412.150 defines the basis of scope of Subpart I —Adjustments to the Base Operating DRG Payment Amounts under the Prospective Payment Systems for Inpatient Operating Costs.  In relevant part, "Section 1886(q) of the Act requires the Secretary to establish a Hospital Readmissions Reduction program, under which payments to applicable hospitals are reduced in order to account for certain excess readmissions, effective for discharges beginning on October 1, 2012.  The rules for determining the payment adjustment under the Hospital Readmissions Reduction Program are specified in §§ 412.152 and 412.154."

52.     In relevant part, 42 C.F.R. § 412.152 defines "Readmission" as "the case of an individual who is discharged from an applicable hospital, the admission of the individual to the same or another applicable hospital within a time period of 30 days from the date of such discharge."  42 C.F.R. § 412.152 further defines which hospitals qualify as "applicable" and many terms to be used in 42 C.F.R. § 412.154 for the determination of payment adjustments under the Hospital Readmissions Reduction Program for applicable hospitals to account for excess readmissions in the hospital.

53.    Generally, "to account for excess readmissions, except as provided for in paragraph (d) of this section, an applicable hospital's base operating DRG payment amount is adjusted for each discharge occurring during the fiscal year.  The payment adjustment for each discharge is determined by subtracting the product of the base operating DRG payment amount (as defined in § 412.152) for such discharge by the hospital's readmission payment adjustment factor for the fiscal year from the base operating DRG payment amount for such discharge."  42 C.F.R. § 412.154 (b)(1).

## THE RELATIONSHIP BETWEEN DEFENDANTS AND MEDICAID AND MEDICARE

54.    OhioHealth's principal business is to provide inpatient and certain outpatient health care services to patients in its various facilities throughout the State of Ohio including physician care, acute care and post-acute care.  When OhioHealth serves patients in its facilities, it submits reimbursement claims on behalf of those patients to their insurers, including Medicare and Medicaid.  At discharge, OhioHealth refers patients in need of post-acute inpatient health care to the sixteen (16) SNFs it has selected to participate in the OhioHealth SNF Network.  In turn, the Network SNFs submit claims for reimbursement on behalf of those patients to their insurers, including Medicare and Medicaid.

55.    The principal business of each Network SNF is to provide skilled nursing care and other rehabilitation healthcare services to patients requiring such.  When the SNFs provide care to patients, the SNFs submit claims for reimbursement on behalf of those patients to their insurers, including Medicare and Medicaid.

### *Medicaid*

56.    Medicaid is a joint federal-state health insurance program.  The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage

("FMAP"), is based on the state's per capita income compared to the national average.  42 U.S.C. § 1396d(b).  The FMAP is at least 50% in each state, and specifically 62.64% in Ohio.

57.    Ohio's Medicaid program reimburses SNFs for skilled nursing, therapy and other related health care services.  "Reimbursement is made only for those covered services that are medically necessary and received by eligible Medicaid consumers.  The amount of payment is determined in accordance with federal and state laws and regulations." O.A.C. 5160-1-60.

58.    Payment from Medicaid is conditioned upon a provider's certification of compliance with all applicable laws and regulations including the Ohio and federal fraud and abuse laws.

*Medicare*

59.    Medicare is a federally funded and administered health insurance program.  HHS administers the Medicare program through the Centers for Medicare & Medicaid Services ("CMS").

60.    To be eligible for payment under the Medicare program, the provider must certify it understands that payments of claims are conditioned on the claims and the underlying transactions complying with applicable laws, including the AKS.

61.    Reimbursement from Medicare is conditioned upon a provider's certification of the following:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL, AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW.  FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT…

I FURTHER CERTIFY THAT I AM FAMILIAR WITH THE LAWS AND REGULATIONS REGARDING THE PROVISION OF HEALTH CARE SERVICES AND THAT THE SERVICES IDENTIFIED IN THIS COST REPORT WERE PROVIDED IN COMPLIANCE WITH SUCH LAWS AND REGULATIONS.

## FACTUAL ALLEGATIONS

62.     The OhioHealth SNF Network is an elaborate scheme designed and orchestrated by OhioHealth that allows SNFs to curry favor with OhioHealth, which is the referral source for many patients.   For a SNF to be included in the OhioHealth SNF Network, OhioHealth demanded kickbacks from the SNF. OhioHealth only selected SNFs for the OhioHealth SNF Network that agreed to participate in a cross-referral agreement and financially benefited OhioHealth by absorbing costs that OhioHealth would otherwise absorb.  To maintain a position in the OhioHealth SNF Network, each SNF must continue to participate in the cross-referral agreement, absorb many costs that OhioHealth would otherwise absorb, and provide various extraordinary services to OhioHealth.

63.     Publicly-funded healthcare programs are forbidden by law and by regulation from reimbursing healthcare providers for services that were provided as a result of kickbacks.

64.     OhioHealth SNF Network is a preferred network of sixteen (16) Medicare certified SNFs.  OhioHealth exclusively refers Medicare patients from OhioHealth hospitals that require skilled nursing care to the Network SNFs.  OhioHealth has a tremendous opportunity to influence patient referrals to SNFs through their discharge planners and is exercising that influence to direct and steer patients to the Network SNFs.

65.     OhioHealth created the OhioHealth SNF Network and selected the SNFs that participate in the network.  OhioHealth determined, in its sole discrction, the criteria a SNF must satisfy to be selected for the OhioHealth SNF Network.  Additionally, OhioHealth determined, in its sole discretion, the requirements and rules that govern the OhioHealth SNF Network.

66.    The SNFs not selected to be a part of the OhioHealth SNF Network are materially disadvantaged in the Columbus, Ohio market where OhioHealth hospitals discharge thousands of patients per year for skilled nursing care.  Many of the SNFs not selected have suffered great financial injury as a result of OhioHealth's creation of the OhioHealth SNF Network - financial injury that was both foreseeable and inevitable.

67.    Pursuant to the Affidavit of Expert Opinion of Bert P. Cummins, Bert P. Cummins, a subject matter expert on skilled nursing costs in Ohio, estimates the cost of not being selected to participate in the OhioHealth SNF Network for a Columbus, Ohio area SNF to be $1,752,384 in lost revenue and average lost margin of approximately $373,065.  A copy of the Affidavit of Expert Opinion of Bert P. Cummins is attached hereto as Exhibit "2" and incorporated by reference herein.

**A.    The OhioHealth SNF Network Selection Process.**

68.    In 2013, OhioHealth invited SNFs in the Columbus, Ohio area ("Applicant SNFs") to apply for admission into the OhioHealth SNF Network.  SNFs that were interested in participating in the OhioHealth SNF Network received at minimum the following documents from OhioHealth:  (i) "Preliminary Expectations for OhioHealth Skilled Nursing Facility (SNF) Continuing Care Network (CCN)" (the "List of Preliminary Expectations") and (ii) "OhioHealth SNF Survey Form" ("Survey Form").  Copies of the List of Preliminary Expectations and the Survey Form are attached hereto as Exhibits "3" and "4" and incorporated by reference herein.

69.    OhioHealth requires SNFs selected to participate in the OhioHealth SNF Network to achieve the specific requirements and perform the specific extraordinary services detailed in the List of Preliminary Expectations.

70. The List of Preliminary Expectations includes, without limitation, a SNF achieving or performing each of the following:

(i) Easy Access for OhioHealth Hospital's Patient Discharges.

    a. Ability to have a firm commitment for admissions to the SNF within two (2) hours of notification of patient day and time of discharge; and

    b. SNF's readiness to admit OhioHealth patients twenty-four (24) hours a day, seven (7) days a week, including emergent admission on weekends, evenings, and nights.

(ii) Degree of Integration with OhioHealth Care Continuum.

    a. SNFs have one or multiple components in place which integrate with the current OhioHealth continuum and evidence physician satisfaction and patient choice through high utilization of the SNF patients discharged from OhioHealth hospitals;

    b. Presence of OhioHealth affiliated physician within the SNF; and

    c. Existence of specialty programs which directly link to OhioHealth service lines and specialized patient needs (e.g. ventilator unit).

(iii) Medical Staff

    a. Attending physician at the SNF shall include one or more primary care physicians and extenders that are part of OhioHealth's affiliated physician network.

(iv) Clinical and Operational Good Practices

    a. Willingness to accept a reasonable amount of Medicaid pending and charity patients.

71.     To be considered for the OhioHealth SNF Network, OhioHealth required SNFs to complete the Survey Form so OhioHealth could measure which SNFs were fitted to further OhioHealth's agenda.

72.     The Survey Form required Applicant SNFs to submit, among other items, the following information to OhioHealth: (i) name of the Applicant SNF's Medical Director; (ii) name of the Applicant SNF's Ancillary Providers (Therapies, Pharmacy, Lab Provider, X-Ray Provider); (iii) average admissions per week both from OhioHealth hospitals and non-OhioHealth hospitals; (iv) admission hours for unplanned admissions from a hospital; (v) all cause 30-day re-hospitalization rate year-to-date; (vi) percentage of patients discharged from the Applicant SNF to home health agencies and whether Applicant SNF or parent company owns a home health agency; and (vii) percentage of patients discharged from the Applicant SNF to hospice agencies and whether the Applicant SNF or parent owns a hospice.

i)   **Network SNFs were not selected based on quality of care or convenience.**

73.     Despite OhioHealth's representation to the Applicant SNFs that the selection would be based on quality of care and convenience (specifically, geographic proximity to four OhioHealth facilities: Doctor's Hospital, Dublin Methodist Hospital, Grant Medical Center, and Riverside Methodist Hospital), OhioHealth's true focus in the selection process was maximizing its revenue and lowering its costs.

74.     First, the Network SNFs were not selected based on quality of care, because SNFs with higher quality ratings were excluded from the OhioHealth SNF Network. In the list of Preliminary Expectations distributed by OhioHealth to Applicant SNFs, OhioHealth represented that Applicant SNFs should meet or exceed the median for federal quality standards by achieving

at least a median rating overall in each of the categories in the Center for Medicare and Medicaid Service's ("CMS") Five-Star Quality Rating System.

75.     CMS assigns each SNF a rating of 1-star to 5-stars in each of the following categories: Health Inspections, Staffing, Quality Measures, and Overall Rating.  Nationally, a 1-star rating is considered much below average, a 2-star rating is considered below average, a 3-star rating is considered average (the median), a 4-star rating is considered above average, and a 5-star rating is considered much above average.

76.     Of the Applicant SNFs, the CMS Five-Star Quality Rating System average Overall Rating was 3-stars, the average Health Inspections rating was 2.17-stars, the average Staffing rating was 3.19-stars, and the average Quality Measures rating was 4.31-stars.

77.     Only six of the sixteen Network SNFs received either a 4-stars or 5-stars Overall Rating.  Five of the Network SNFs received an Overall Rating of 3-stars.  The remaining five Network SNFs all received an Overall Rating of 2-stars or 1-star, deeming them below average or much below average.

78.     Twenty-four of the Applicant SNFs received either a 4-stars or 5-stars Overall Rating.  OhioHealth selected only six of the twenty-four Applicant SNFs with an Overall Rating of 4-stars or 5-stars to be a part of the OhioHealth SNF Network.

79.     Eleven of the sixteen Network SNFs received a Health Inspections rating below both the national median and the average for all Applicant SNFs.  Three of the sixteen Network SNFs received a Staffing rating below the national median and six of the sixteen Network SNFs received a Staffing rating below the average for all Applicant SNFs.  Two of the sixteen Network SNFs received a Quality Measures rating below the national median and thirteen of the sixteen Network SNFs received a Quality Measures rating below the average for all Applicant SNFs.

80.    Of the eight Applicant SNFs who received a 5-star Overall Rating, only one was selected.  Of the sixteen Applicant SNFs who received a 4-star Overall Rating, only five were selected.

81.    Contrary to OhioHealth's representations, the OhioHealth SNF Network was not created to "work toward the goal of delivering high quality care" or to provide "patients with the best possible quality of care after they leave the hospital."  The Network SNFs are neither "required to meet certain quality and performance standards," nor are they required to "continually demonstrate high quality."  This is evidenced by OhioHealth's selection of multiple facilities that have been deemed much below the average.

82.    Second, the Network SNFs were not selected based on convenience, because SNFs with higher quality ratings closer to OhioHealth's hospitals were excluded from the OhioHealth SNF Network.

83.    In the list of Preliminary Expectations distributed by OhioHealth to Applicant SNFs, OhioHealth further represented the importance of each SNF's geographic proximity to four OhioHealth facilities: Doctor's Hospital, Dublin Methodist Hospital, Grant Medical Center, and Riverside Methodist Hospital.

84.    There were seven Applicant SNFs located within a five-mile radius of Dublin Methodist Hospital.  Four of these seven Applicant SNFs were selected, one of which maintains only a 2-star Overall Rating.  Each of the three Applicant SNFs not selected maintain either a 4-star or 5-star Overall Rating.

85.    There were fifteen Applicant SNFs located within a five-mile radius of Riverside Methodist Hospital.  Eight of these fifteen Applicant SNFs were selected, each of which

maintain an Overall Rating ranging from 3-stars to 5-stars.  Each of the five Applicant SNFs not selected maintain an Overall Rating ranging from 3-stars to 5-stars.

86.     There were thirteen Applicant SNFs located within a five-mile radius of Grant Medical Center.  Two of these thirteen Applicant SNFs were selected, one of which maintains a 2-star Overall Rating.  Five of the Applicant SNFs not selected maintain a 3-star, 4-star, or 5-star Overall Rating.

87.     There were four Applicant SNFs located within a five-mile radius of Doctor's Hospital.  Two of these four Applicant SNFs were selected, one of which maintains a 3-star Overall Rating and the other maintains a 4-star Overall Rating.  One of the Applicant SNFs not selected maintains a 5-star Overall Rating.

88.     OhioHealth also selected four Applicant SNFs to become a part of the OhioHealth SNF Network that were not within a 5-mile radius of any of the above hospitals: Arbors West, Scioto Community, The Laurels of Norworth, and Heartland of Uptown Westerville.  Three of these four Network SNFs maintain either a 1-star or 2-star Overall Rating.  There were viable alternatives available closer to each of the four OhioHealth hospitals with higher Overall Ratings than each of these selections.

89.     Many of the SNFs excluded from the OhioHealth SNF Network were more qualified to meet the OhioHealth SNF Network's goals as represented by OhioHealth.  The exclusion of more highly qualified SNFs provides evidence that quality of care was not determinative.

**ii) OhioHealth only selected SNFs that agreed to participate in a cross-referral agreement and absorb costs that OhioHealth would otherwise absorb.**

90.    OhioHealth only selected SNFs for the OhioHealth SNF Network that agreed to participate in a cross-referral agreement and financially benefited OhioHealth by absorbing costs that OhioHealth would otherwise absorb.

91.  .  First, regarding the cross-referral agreement, OhioHealth only selected SNFs to participate in the OhioHealth SNF Network that provided OhioHealth facilities (hospitals and affiliated healthcare facilities and clinics) a steady stream of patient referrals.  Selecting such Applicant SNFs, among other reasons, secured those streams of patient referrals for OhioHealth in the future.  Additionally, to be selected for participation in the OhioHealth SNF Network, each Applicant SNF had to assent to refer patients toward OhioHealth facilities (hospitals and affiliated healthcare facilities and clinics) for services outside the scope of skilled nursing care.

92.    The Preliminary Expectations and Survey Form incorporate illegal referral relationships by requiring, without limitation, the following: (i) the presence of OhioHealth physicians in Network SNF facilities, implying a required referral of OhioHealth physicians to Network SNF residents; (ii) upon information and belief, the appointment of one or more OhioHealth physicians as Medical Director in exchange for the exclusive referrals from OhioHealth hospitals; (iii) network SNFs to have specialty programs that provide referral opportunities to OhioHealth's ancillary services; and (iv) upon information and belief, Network SNFs are expected to refer to OhioHealth's in-home programs including home health care and other post-acute services.

93.    Second, OhioHealth only selected SNFs for the OhioHealth SNF Network which financially benefited OhioHealth and absorbed costs that OhioHealth would otherwise absorb. Among other things, OhioHealth only selecting SNFs (i) that could reduce OhioHealth's

operating costs by accelerating the discharge process for Medicare patients from OhioHealth hospitals, which financially benefits OhioHealth considering OhioHealth is compensated for their services based on a diagnosis related group; and (ii) reduce its hospital readmission penalties by selecting SNFs with low 30-day hospital readmissions rates.

94.     Under the Medicare fee-for-service reimbursement structure, OhioHealth may submit a claim for reimbursement for any covered service it provides a Medicare patient. Medicare pays OhioHealth based on diagnosis related groups, or DRGs, that pays an OhioHealth hospital a single fixed payment for services related to a specific diagnosis and not the actual level of services required for the particular patient.  A patient's length of stay is not considered in calculating the amount to be reimbursed for the service in one of OhioHealth's hospitals. OhioHealth must provide for a Medicare patient's needs (e.g. a bed, meals, nursing care) until said patient is discharged.  Therefore, a Medicare patient's length of stay correlates negatively with OhioHealth's profit for the service it provided (e.g. a longer stay yields less profit; a shorter stay yields more profit).  For this reason, expediting the discharge of Medicare patients from OhioHealth facilities financially benefits OhioHealth.

95.     In the Survey Form, OhioHealth required Applicant SNFs to provide to OhioHealth the ability (i) to have a firm commitment for admission to the SNF within two hours of notification of patient day and time of discharge and (ii) the SNF's readiness to admit the patient twenty-four (24) hours a day, seven (7) days a week, including emergency admissions on weekends, evenings, and nights.

96.     OhioHealth only selected Applicant SNFs who provided that they would accept unplanned admits from OhioHealth twenty-four (24) hours a day, seven (7) days a week and

provide commitments for admissions to OhioHealth within two (2) hours of notification of patient day and time of discharge.

97.     Accelerating the discharge process qualifies as remuneration and financially benefits OhioHealth because it moves a patient quicker from OhioHealth to a SNF, lowers the cost OhioHealth has to expend on a patient, and decreases the amount of work performed by OhioHealth's discharge planners.

98.     In the Survey Form, OhioHealth required each Applicant SNF to provide the percentage of all cause 30-day re-hospitalizations year-to-date for Medicare Part A patients and all other patients.  OhioHealth further required each Applicant SNF to provide the percentage of Medicare Part A patients it discharges home per month.  OhioHealth pre-selected only referring Applicant SNFs with a 30-day hospital readmissions rate below 19.8%.

99.     OhioHealth is using the OhioHealth SNF Network as a tool to avoid payment adjustments for excess Medicare patient readmissions under the Hospital Readmissions Reduction Program.  The assurance of a decreased hospital readmission rate is highly valuable to OhioHealth and qualifies as remuneration. OhioHealth's solicitation of such an assurance in exchange for referrals amounts to a violation of the AKS.

B.     **Operation of the OhioHealth SNF Network.**

100.     The effective launch date of the OhioHealth SNF Network was on or about March 1, 2014.

101.     OhioHealth selected only sixteen (16) SNFs out of approximately fifty-five (55) SNFs in the OhioHealth service area to participate.  OhioHealth now exclusively directs and steers patients to the sixteen (16) Network SNFs and the SNFs not selected to participate are

materially disadvantaged.  In its operation, only Network SNFs in the OhioHealth SNF Network receive referrals from OhioHealth hospitals.

**i)  Network SNFs must continue to absorb many costs that OhioHealth would otherwise and provide extraordinary services to OhioHealth.**

102.    To maintain a position in the OhioHealth SNF Network, each Network SNF must continue to absorb many costs that OhioHealth would otherwise absorb and provide extraordinary services to OhioHealth pursuant to the "OhioHealth Skilled Nursing Facility (SNF) Continuing Care Network Handbook of Quality Requirements" (the "Handbook") and Continuing Care Network Skilled Nursing Facility Provider Agreement (the "Provider Agreement").

103.    In January 2015, OhioHealth distributed the Network SNFs the Handbook.  The Handbook amends and restates the List of Preliminary Expectations that OhioHealth previously distributed to the SNFs. Like the Credentialing Criteria, the Handbook is two-tiered: (1) quality requirements for Network SNFs effective March 1, 2015 and (2) expectations for Network SNFs effective March 1, 2015.  Copies of the Credentialing Criteria and the Handbook are attached hereto as Exhibits "5" and "6" and incorporated by reference herein.

104.    Pursuant to the Handbook, the failure of a Network SNF to comply with the quality requirements will result in that SNF's termination from the OhioHealth SNF Network. The quality requirements are in addition to the requirements of the Provider Agreement. A copy of the Provider Agreement is attached hereto as Exhibit "7" and incorporated by reference herein.

105.    Pursuant to the Handbook, the expectations are aspirational goals that Network SNFs are expected to use reasonable efforts to meet.  If a Network SNF is unable to meet one of

the goals, the Network SNF must create a plan to enable the Network SNF to meet the goal. Over time, OhioHealth intends to move the quality expectations to requirements.

106.  The requirements and expectations in the Handbook and Provider Agreement are simply a list of demands from OhioHealth for extraordinary services by the selected SNFs in exchange for an exclusive referral arrangement.

107.  Pursuant to an Affidavit of Expert Opinion of Bert P. Cummins, Bert P. Cummins, a subject matter expert on skilled nursing costs in Ohio, estimates that the approximate costs incurred by each Network SNF to satisfy the requirements and expectations of OhioHealth and maintain its position in the OhioHealth SNF Network as follows: (i) annual recurring costs of approximately $332,979 to $1,313,239 per year; (ii) if the Network SNF does not have a dedicated wing, the Network SNF may incur an initial cost in excess of $10,000 for the construction of a new wing as a dedicated unit for patients who require short term skilled nursing services; (iii) if the Network SNF does not have an EMR, the Network SNF will incur the one time set-up costs of approximately $30,000 to $50,000 for the installation of an EMR system and $1,120 for the implementation of INTERACT 3.0 tools; and (iv) other costs depend on outside factors: $100 per visit from a Primary Care Provider and  many other incalculable costs.  A copy of the Affidavit of Expert Opinion of Bert P. Cummins is attached hereto as Exhibit "2" and incorporated by reference herein.

108.  The Handbook and the Provider Agreement complement each other in furthering OhioHealth's agenda.  Under Section 11.1 of the Provider Agreement, OhioHealth reserves the right to terminate a SNF in the OhioHealth SNF Network "without cause upon thirty (30) days prior written notice to the other party."  In operation, the list of "aspirational quality goals" amount to requirements because of OhioHealth's position of influence.  The looming threat of

termination from the OhioHealth SNF Network and accompanying loss of value associated with being a referral participant in the OhioHealth SNF Network forces the Network SNFs to take all measures to comply with the demands, both the requirements and expectations of OhioHealth.

109.    The Handbook has the following requirements, effective March 1, 2015, which Network SNFs are required to meet in order to be included in the OhioHealth SNF Network.  All of the requirements provide value to OhioHealth.  The requirements are as follows for each Network SNF:

      (i)  Medicare Patients

          a.  Accept Medicare Patients;

      (ii)  Staffing

          a.  Maintain a dedicated unit for patients who require short-term skilled nursing or rehabilitative services prior to returning home;

          b.  Maintain twenty-four (24) hours a day, seven (7) days a week RN care in the short-term skilled unit; disclose to OhioHealth any staffing changes that impact the Network SNF's ability to maintain twenty-four (24) hours a day, seven (7) days a week direct patient RN coverage;

          c.  RN clinical leader must conduct annual competency evaluations of all nursing staff and provide educational events (bi-monthly minimum) on best nursing practices;

      (iii)  Committee Commitments

          a.  Appoint Administrator and Director of Nursing to sit on the OhioHealth SNF CCN Member Committee, where attendance at

monthly meeting is required; three absences are permitted by the Administrator and DON each but representation for the Network SNF is still required on at least one of the current SNF CCN committees, not including the Member Committee;

(iv)  Data Tracking

    a.  Appoint a SNF staff member to record data on OhioHealth patients in a tracking program;

    b.  Designated metrics in a tracking program on all OhioHealth patients no later than the third business day of the month for all patients discharged from the SNF the previous month;

(v)  Chart Audits

    a.  Chart audits will be conducted monthly to verify the integrity of the data being recorded into OhioHealth tracking programs;  If integrity of data is found to be in question, then written notice will be provided to the Network SNF;  Continued integrity issues with data will be considered a violation of the Provider Agreement;

(vi)  JumpStart Program

    a.  Complete the OhioHealth JumpStart Program within the first three months of participation in the OhioHealth SNF Network based on the same terms as provided in the Credentialing Criteria;

(vii)  Medication Reconciliation

    a.  Medication reconciliation is to be completed at the time of admission and discharge for all OhioHealth patients;

(viii)   Complaint and Grievance Reporting

    a.  SNF must immediately report the following items to the OhioHealth SNF Network Program Coordinator:

        i.  Any OhioHealth SNF Network patient complaint or grievance;

        ii.  Any final notice of a CMS Immediate Jeopardy citation;

        iii.  Any termination of any license certification, registration, or permit necessary to participate in the OhioHealth SNF Network or Medicare Program; and

        iv.  For SNF patient complaints, the Network SNF must promptly investigate the complaint and do its best to resolve them informally in a fair and equitable manner.

110.   The Handbook details the following aspirational goals that Network SNFs are expected to use reasonable efforts to meet in order to be included in the OhioHealth SNF Network.  All of the aspirational goals provide value to OhioHealth.  The aspirational goals are as follows for each Network SNF:

    (i)  Patient Admission

        a.  All patients who meet Medicare fee-for-service requirements for skilled care are accepted by the Network SNF as select by the patient;

        b.  Prioritize OhioHealth patients for admission and work to flex beds to meet the needs of the OhioHealth SNF Network;

    (ii) Hospital Readmission Rate

     a.  Achieve and maintain a 30-day all cause hospital readmission rate at or below 19 percent for OhioHealth Medicare fee-for-service patients, as measured by OhioHealth data;

     b.  Monitor all payers and readmissions;

     c.  Monitor OhioHealth patient ED visits within 72 hours of admission into the SNF;

(iii)  Average Length of Stay

     a.  Achieve and maintain an average length of stay for all skilled rehab patients discharged from an OhioHealth acute hospital that is less than or equal to twenty-one (21) days;

     b.  Achieve and maintain an average length of stay for post-surgical joint replacement patients that is less than or equal to fourteen (14) days;

(iv)  Nursing Ratios

     a.  Establish and maintain a minimum ratio of one (1) RN to fifteen (15) skilled rehab patients;

(v)  Staff Expectations

     a.  Admission's coordinator or liaison with the clinical competency and resources available to review complex medical patients for admission to the SNF and admit patients within a required two (2) hour time frame;

     b.  Arrange for a physician or advanced practitioner to evaluate all OhioHealth patients within forty-eight (48) hours of admission to the Network SNF;

    c. Conduct a care conference involving the patient, family, and appropriate SNF staff to discuss a preliminary plan of care as well as the discharge plan and target discharge date within seventy-two (72) hours of admission to the SNF;

    d. Provide patients with hospice services when appropriate;

    e. Schedule all patients admitted from OhioHealth to be seen by a primary care provider within seven (7) calendar days;

(vi) Seven Day Therapy

    a. Provide necessary seven (7) days a week therapies to skilled rehab patients, including twice a day therapies seven (7) days a week when necessary;

(vii) Discharge to Community

    a. Discharge at least sixty (60) percent of OhioHealth Medicare fee-for-service patients to the community;

(viii) Compliance with Federal and State Regulations

    a. Total number of survey deficiencies is less than the average in the state of Ohio and no civil monetary penalties;

(ix) Meets or Exceeds Median for Federal Quality Standards

    a. Achieve at least a three (3) star rating overall in each of the three categories on CMS's Nursing Home Compare website;

(x) Electronic Medical Records

    a. Fully implement an Electronic Medical Record within the SNF;

(xi) Medicaid Pending and Charity Patients

     a.  Willingness to accept a reasonable amount of Medicaid pending and charity patients and will develop a policy which meets the needs of OhioHealth patients and the Network SNF;

(xii)  OhioHealth Episode of Care Pathways

     a.  Implement OhioHealth developed care pathways for targeted clinical conditions;

(xiii)  Patient Satisfaction

     a.  Achieve a "greater than 90% average of OhioHealth patients who 'probably' or 'definitely' would recommend the SNF to others";

(xiv)  Respiratory Therapy

     a.  Access to a respiratory therapist, all shifts, for patients requiring this level of expertise for best patient outcomes; and

(xv)  Use of Interact 3.0 Tools

     a.  Actively utilize Interventions to Reduce Acute Care Transfers (INTERACT) 3.0 tools, including the advance care planning tools.

111.    The aspirational goals that Network SNFs are expected to use their reasonable best efforts to meet (soon to be requirements), are valuable to OhioHealth and therefore qualify as remuneration.

112.    The requirements and aspirational goals are higher than the Medicare requirements for a SNF. Pursuant to 42 CFR §483.30 Medicare certified SNFs are not required to:

(i)    Provide twenty-four (24) hours a day, seven (7) days a week or emergent, weekend and evening admissions within a two (2) hour window. By providing this costly

37

extraordinary admission process to OhioHealth patients, the Network SNFs are providing OhioHealth illegal remuneration in the form of assisting the OhioHealth hospitals in maximizing its Medicare DRG reimbursement with earlier discharges;

(ii)    Provide twenty-four (24) hours a day, seven (7) days a week RN services and establish and maintain a minimum ratio of one (1) RN to fifteen (15) skilled rehab patients. *See* 42 CFR §483.30(a).  By providing this costly expansive RN coverage, the Network SNFs are acquiescing to OhioHealth's demand to obtain referrals by providing OhioHealth illegal remuneration in the form of assisting the hospital in maximizing its Medicare DRG reimbursement by having a large and robust nursing staff to care for patients which allows OhioHealth to discharge patients earlier;

(iii)    Conduct case conferences within seventy-two (72) hours of patient admission.  Acquiescing to OhioHealth's demand for these case conferences is a benefit to OhioHealth in promoting a reduction of readmission provided by the Network SNFs to induce OhioHealth referrals; and

(iv)    Accept charity or non-insured patients.  While hospitals are generally required to admit charity or non-insured patients, SNFs are not legally required.  SNFs generally do not accept charity patients, since SNFs do not accept a patient knowing that the patient does not have the ability to pay or quality for Medicaid.  The Network SNFs have acquiesced to this demand by OhioHealth to be within the OhioHealth SNF Network to obtain referrals.  By Network SNFs accepting charity or non-insured patients from OhioHealth, this reduces patient care costs for OhioHealth.

113. Upon Information and belief, the extraordinary admission and staffing processes provided by Network SNFs incorporates and assumes discharge planning duties of OhioHealth hospitals.

114. Paragraphs above show that remuneration was solicited by OhioHealth, and offered and paid by the Network SNFs in order to induce the referral of government healthcare business, namely Medicare.

115. Both in design and more importantly in operation, the OhioHealth SNF Network requires the Network SNFs to provide OhioHealth illegal remuneration in the form of services and referrals to assure referrals from OhioHealth for post-acute skilled nursing facility services.

**ii) OhioHealth directed and steered patients to the Network SNFs and each Network SNF directed and steered patients to OhioHealth based on a cross-referral agreement.**

116. Once the OhioHealth SNF Network was in place, OhioHealth directed and steered patients to the Network SNFs. In furtherance of the kickback scheme, OhioHealth and the Network SNFs concealed key aspects of their relationship from patients and the Government.

117. First, when OhioHealth recommended a patient to a Network SNF, OhioHealth presented these recommendations as unbiased professional opinions, without disclosing that OhioHealth stood to benefit financially as a result of this recommendation. When a Network SNF refers a patient to a OhioHealth facilities (hospitals and affiliated healthcare facilities and clinics) for services outside the scope of skilled nursing care, the Network SNF presented these recommendations as unbiased professional opinions, without disclosing that the Network SNF stood benefit financially as a result of this recommendation. More often than not, patients will follow the recommendation of a hospital or SNF regarding the best healthcare provider for their condition.

118.    Under this kickback arrangement, OhioHealth exclusively refers Medicare patients to the Network SNFs, even though those facilities might not offer the most expert services for that particular patient.  Pursuant to the Affidavit of Facts of Roger D. King, Relator spoke with various administrators, owners, and other individuals in power in the skilled nursing care industry in the Columbus, Ohio area regarding the OhioHealth SNF Network.  Multiple individuals have indicated that Kelly Belcher, Program Manager for the OhioHealth SNF Network, assured them that OhioHealth's discharge planners would direct and steer at least ninety percent (90%) of Medicare patients seeking skilled nursing care to the Network SNFs in the OhioHealth SNF Network.  A copy of the Affidavit of Facts of Roger D. King is attached hereto as Exhibit "1" and incorporated by reference herein.

119.    Additionally, the kickback arrangement induces the Network SNFs to exclusively refer patients to OhioHealth facilities (hospitals and affiliated healthcare facilities and clinics) for services outside the scope of skilled nursing care, even though these healthcare entities might not offer the most expert services for that particular patient.  Pursuant to the Affidavit of Facts of Roger D. King, Relator spoke with various administrators, owners, and other individuals in power in the skilled nursing care industry in the Columbus, Ohio area regarding the OhioHealth SNF Network. Multiple individuals have indicated that Ms. Belcher represented that OhioHealth demanded patients discharged from the skilled nursing facilities in the OhioHealth SNF Network to be referred back to OhioHealth and entities associated with OhioHealth for services outside the scope of skilled nursing care.

120.    Network SNFs have fulfilled their obligation to exclusively refer back to OhioHealth for services outside the scope of skilled nursing care, for pursuant to Affidavit of Facts of Elizabeth Zink-Pearson, an attorney that provides legal services to various post-acute

health care providers throughout the State of Ohio, various home health providers in the Columbus, Ohio area have reported sharp declines in referrals from the Network SNFs for home health services after the OhioHealth SNF Network became operational.  After the home health providers inquired with the Network SNFs regarding the decrease in referrals, two Network SNFs stated that OhioHealth requires them now to refer all patients to OhioHealth affiliated home health or hospice providers. A copy of the Affidavit of Facts of Elizabeth Zink-Pearson is attached hereto as Exhibit "8" and incorporated by reference herein.

121.   Second, to ensure OhioHealth and Network SNFs would reap the benefits of the OhioHealth SNF Network, the parties ignored compliance issues raised by the kickback scheme arrangement in violation of the Provider Agreement.

122.   This OhioHealth orchestrated kickback scheme has been highly lucrative. OhioHealth reduced their costs and Network SNFs received increased referrals from Medicare. OhioHealth has received increased referrals from the Network SNFs.

123.   Patients have borne the cost of the kickback scheme orchestrated by OhioHealth. Specifically, hundreds, possibly thousands, of patients have been directed to Network SNFs or OhioHealth facilities as a result of recommendations of OhioHealth or the Network SNF that were based on undisclosed financial, rather than independent clinical considerations.  Further, Medicare and other publicly funded healthcare programs have paid millions of dollars to OhioHealth and the Network SNFs based on false claims that were never entitled to federal reimbursement.

C.   **OhioHealth and the Network SNFs knowingly disregarded their duty to comply with the AKS when carrying out the kickback scheme.**

124.   OhioHealth and the Network SNFs knew they were required to comply with the AKS in selection and operation of the OhioHealth SNF Network, because as Section 13.10 of the

Provider Agreement states "[i]t is neither an express nor implied purpose of this Agreement to induce or encourage the referral of patients or the payment directly or indirectly of any remuneration to Facility (Network SNF) or OhioHealth in violation of applicable laws, rules, and regulations. The parties agree that the benefits to Facility (Network SNF) and OhioHealth hereunder do not require, are not payment or inducement for, and are not in any way contingent upon the admission or referral of any patient, or any other arrangement for the provision of any item or service offered by OhioHealth or Facility (Network SNF) to any of their respective patients."

125.    In addition, upon information and belief, OhioHealth and each Network SNF has in place ethics and compliance policies that provide the AKS makes it illegal to knowingly and willfully demand remuneration in return for referring a person to another person for items or services covered under federal health care program or purchasing or recommending the purchase of any good or service which is paid for by federal healthcare programs.

126.    At all relevant times, OhioHealth and the Network SNFs were aware that Medicare covered reimbursement for the Medicare referrals made by OhioHealth that were tainted by the kickbacks.

127.    Although OhioHealth knew that the AKS prohibited it from demanding kickbacks from SNFs in exchange for referrals, it disregarded that prohibition, choosing instead to put profit and cost reduction before its duty to comply with federal law.  Network SNFs acquiesced to OhioHealth's demands for remuneration in order to receive the exclusive referral arrangement.

128.    OhioHealth and the Network SNFs both knew that it was unlawful to condition participation in the OhioHealth SNF Network, and receive referrals for Medicare patients in need of skilled nursing care, based on Network SNFs acquiescing to demands from OhioHealth for

extraordinary services and absorbing costs of OhioHealth in exchange for an exclusive referral arrangement.  It is irrelevant that other quality measures are included in the provisions of the OhioHealth SNF Network, because the AKS is violated if only one purpose of the OhioHealth SNF Network is to unlawfully obtain a benefit in exchange for the referral of services.  If anything, this scheme reduces quality of care because it motivates OhioHealth discharge planners to send patients to SNFs that agree to these requirements rather than sending patients to SNFs that provide the most expert services for that particular patient.

129.    The OhioHealth SNF Network has operated as a cross-referral scheme since its launch on or about March 1, 2014.  OhioHealth and the Network SNFs knew it was unlawful for OhioHealth and the Network SNFs to enter into an arrangement in which the Network SNFs would receive government healthcare business from OhioHealth in exchange for the Network SNF making referrals to OhioHealth and other parties associated with OhioHealth. Patient referrals are valuable and qualify as remuneration.  Such a cross-referral system amounts to a violation of the AKS by both OhioHealth and the Network SNFs.

130.    The Provider Agreement provides that the Network SNFs "shall fully cooperate with and participate in the CCN requirements, including quality assurance, utilization review, and data gathering/monitoring processes."  The Provider Agreement defines "CCN requirements" to include "all network requirements, including credentialing criteria, metrics, reporting, and participation requirements and the documents prepared by the CCN setting forth such requirements, including the Program's rules, requirements, protocols, and criteria, as it is amended and supplemented from time to time."  The Network SNFs willfully signed the Provider Agreement with full knowledge of OhioHealth's requirements and expectations, including those requirements and expectations that qualify as illegal remuneration under the

AKS.  OhioHealth willfully distributed copies of its requirements and expectations to the Network SNFs, many of which amount to illegal remuneration under the AKS.

**D.    Submission of False Claims.**

131.    Medicare and other publicly-funded healthcare programs are the victim of this corrupt arrangement.

132.    As a result of this OhioHealth orchestrated scheme, since on or about March 1, 2014, OhioHealth knowingly caused the Network SNFs to submit millions of dollars in false reimbursement claims for skilled nursing care to publicly-funded healthcare programs. OhioHealth also knowingly submitted false claims to publicly funded healthcare programs for services rendered to those patients referred by the Network SNFs as a result of the cross-referral agreement by and between OhioHealth and each Network SNF.

133.    As a result of this OhioHealth orchestrated scheme, since on or about March 1, 2014, the Network SNFs knowingly submitted millions of dollars in false reimbursement claims to publicly-funded healthcare programs for skilled nursing care that was provided as a result of kickbacks.

134.    Any Medicare claim submitted in connection with this illegal kickback arrangement was false and ineligible for reimbursement, because it was tainted by kickbacks.

<u>COUNT I</u>
**(Violation of the Medicare/Medicaid Anti-Kickback Act 42 U.S.C. §1320a-7b; Against All Defendants)**

135.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 134 as though fully set forth herein.

136.    OhioHealth's solicitation and receipt of illegal remuneration in the form of free services, priority benefits, and referrals from Network SNFs in exchange for referrals of patients

44

for services reimbursed by the Medicare and Medicaid programs violates 42 U.S.C. § 1320a-7(b) a-b.

137.    SNF Network Defendants payment of illegal remuneration in the form of free services, priority benefits, and referrals to OhioHealth in exchange for referrals of patients for services reimbursed by the Medicare and Medicaid programs violates 42 U.S.C. §1320a-7(b)a-b.

**COUNT II**

**(Violation of False Claims Act – Causing the Presentation of False Claims, 31 U.S.C. § 3729(a)(1); Against OhioHealth)**

138.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 137 as though fully set forth herein.

139.    As a result of OhioHealth's solicitation and reception of kickbacks in exchange for patient referrals to the Network SNFs, in violation of the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(1), all of the claims the Network SNFs made, or caused to be made, to Medicaid and Medicare for goods and services related to the referrals are false or fraudulent. Accordingly, OhioHealth knowingly caused false or fraudulent claims to be presented to officials of the United States in violation of 31 U.S.C. § 3729(a)(1).

140.    As a result of OhioHealth's solicitation and reception of kickback in exchange for patient referrals to the Network SNFs, in violation of the federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b)(1), all of the claims OhioHealth made, or caused to be made, to Medicaid and Medicare for goods and services related to the kickbacks are false or fraudulent. Accordingly, OhioHealth knowingly presented, or caused to be presented, false or fraudulent claims to officials of the United States in violation of 31 U.S.C. § 3729(a)(1).

141.    By virtue of the false or fraudulent claims OhioHealth presented, or caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT III
**(Violation of False Claims Act – Making or Using False Records or Statements to Cause Claims to be Paid, 31 U.S.C. § 3729(a)(2); Against OhioHealth)**

142.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 141 as though fully set forth herein.

143.    As a result of OhioHealth's solicitation and reception of kickbacks in exchange for patient referrals to the Network SNFs, in violation of the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2), OhioHealth knowingly caused false records or statements to be made or used to cause the United States to pay or approve false or fraudulent claims.  The false records or statements were the false certifications and representations of full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b.  OhioHealth caused such false certifications and representations to be made in agreements under Ohio's Medicaid program and the federal Medicare program.

144.    By virtue of the false records or statements defendant OhioHealth caused to be made or used, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT IV
**(Violation of False Claims Act – Presentation of False Claims, 31 U.S.C. § 3729(a)(1); Against the Network SNFs)**

145.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 144 as though fully set forth herein.

146.    As a result of the kickback benefits provided by the Network SNFs to induce OhioHealth to refer patients for services covered by Medicare and/or Medicaid, in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2), all of the claims the Network SNFs presented, or caused to be presented, to Medicare and Medicaid for those services are false or fraudulent.  Accordingly, the Network SNFs knowingly presented, or caused to be presented, false or fraudulent claims to officials of the United States in violation of 31 U.S.C. § 3729(a)(1).

147.    By virtue of the false records or statements the Network SNFs presented, or caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT V
**(Violation of False Claims Act – Making or Using False Records or Statements to Cause Claims to be Paid, 31 U.S.C. § 3729(a)(2); Against the Network SNFs)**

148.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 147 as though fully set forth herein.

149.    The Network SNFs knowingly made, used, or caused to be made or used, false records or statements to cause the United States to pay or approve false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2).  The false records or statements were the false certifications and representations of full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b.  The Network SNFs made or caused to be made such false certifications and representations in agreements under the Ohio Medicaid program and the Federal Medicare program when seeking to ensure that Medicaid and Medicare would reimburse for the services provided to patients discharged to Network SNFs.

47

150.    By virtue of the false records or statements the Network SNFs presented, or caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT VI
### (Violation of False Claims Act – Conspiracy to Submit False Claims, 31 U.S.C. § 3729(a)(3); Against All Defendants)

151.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 150 as though fully set forth herein.

152.    Each of the Defendants conspired with the other Defendants to arrange for the Network SNFs to provide kickback benefits in exchange for patient referrals from OhioHealth, in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2), thereby causing all of the claims, from on or shortly after March 1, 2014, through the present, to Medicaid or Medicare for services related to the referrals, to be false or fraudulent.  Accordingly, each of the Defendants conspired to defraud the United States by getting false or fraudulent claims allowed or paid, in violation of 31 U.S.C. § 3729(a)(3).

153.    By virtue of the false or fraudulent claims Defendants conspired to get allowed or paid, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT VII
### (Unjust Enrichment and Disgorgement; Against All Defendants)

154.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 153 as though fully set forth herein.

155.    This is a claim for the recovery of monies by which the Defendants have been unjustly enriched.

156. By directly or indirectly obtaining government funds to which it was not entitled, the Defendants were unjustly enriched, and are liable to account for and to disgorge such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

## COUNT VIII
### (Payment By Mistake; Against All Defendants)

157. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 156 as though fully set forth herein.

158. This is a claim for the recovery of monies by the United States to the Defendants as a result of mistaken understandings of fact.

159. The false claims that the Defendants presented to the United States were based upon mistaken or erroneous understandings of material fact.

160. The United States, acting in reasonable reliance on the accuracy and truthfulness of the information contained in the claims, paid the Defendants, directly or indirectly, certain sums of money to which the Defendants were not entitled, and the Defendants are thus liable to account for and to pay such amounts to the United States.

## COUNT IX
### (Recoupment of Overpayments)

161. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 160 as though fully set forth herein.

162. This is a claim for recoupment, for the recovery of monies paid by the United States to the Defendants contrary to statute or regulation.

163. The United States paid the Defendants certain sums of money to which they were not entitled and the Defendants are thus liable under the law of recoupment to account for and return such monies to the United States, in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator Roger D. King, on behalf of himself and the United States Government, prays that judgment be entered in favor of the United States as follows:

(i)     On Counts I, II and III under the False Claims Act, against OhioHealth, for such amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with such further relief as may be just and proper.

(ii)    On Counts I, IV and V under the False Claims Act, against the Network SNFs, for such amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with such further relief as may be just and proper.

(iii)   On Count VI under the False Claims Act, against all Defendants, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with such further relief as may be just and proper.

(iv)    On Counts VII and VIII, against the Defendants, for unjust enrichment and payment by mistake, for the damages sustained and/or amounts by which the Defendants were unjustly enriched or by which the Defendants retained illegally obtained monies, plus interest, costs, and expenses, and such further relief as may be just and proper.

(v)     On Count IX, against the Defendants, for recoupment, for the monies illegally obtained by the Defendants, plus interest, costs and expenses, and such further relief as may be just or proper.

Respectfully submitted,

KEITH & ASSOCIATES, PLLC

By: _____
        Ann B. Miller (#0000408)
        715 Bakewell St.
        Covington, KY 41011
        Tel: 859-261-6800
        Fax: 859-261-6882
        E-mail: amiller@keithlawyers.com
        *Trial Attorney for Relator Roger D. King*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands that this matter be tried before a jury.

_____
Ann B. Miller (#0000408)
*Trial Attorney for Relator Roger D. King*